THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE 
 CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 
 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
KCI Management Corporation and Alexis Pierre
Kisteneff,        Respondents,
 
 
 

v.

 
 
 
Bara Post, Individually and as Personal Representative of the Estate 
 of Malcolm Post, deceased,        Appellant.
 
 
 

Appeal From Greenville County
Alison Renee Lee, Circuit Court Judge

Unpublished Opinion No. 2004-UP-147
Heard February 11, 2004  Filed March 
 1, 2004 

AFFIRMED

 
 
 
James C. Parham, Jr. and William M. Wilson, both of Greenville; 
 and Laurence M. Johnson, of Boston, for Appellant.
Robert "Sam" Phillips and Richard R. Gleissner, 
 both of Columbia; and Robert C. Wilson, Jr., of Greenville, for Respondents.
 
 
 

PER CURIAM:  KCI Management Corporation 
 brought this declaratory judgment action to determine the rights of Malcolm 
 Post in properties that were part of real estate development projects. [1]   This action revolves around a dispute between 
 Post and his former business associate, Alexis Pierre Kisteneff, as to whether 
 Post held an interest in real property they had planned to develop.  The case 
 was tried to a jury before the Circuit Court of Greenville County on a special 
 interrogatory as to whether a partnership existed between Post and Kisteneff 
 relating to their real estate development plans.  The jury found they had not 
 entered into a partnership, thereby foreclosing Posts claim of an ownership 
 interest in the real estate in dispute.  Bara Post appeals.  We affirm.
FACTUAL/PROCEDURAL BACKGROUND
At the center of this case is the business relationship 
 that developed between Kisteneff and Malcolm Post.  Several key facts are clear 
 and undisputed:  Both gentlemen had varying experiences in real estate speculation 
 and development prior to their association.  Both were interested in pursuing 
 some type of real estate venture together after they were introduced to each 
 other in 1995.  Only Kisteneff invested money in the projects; Post made no 
 financial contributions.  None of the potential projects the two men attempted 
 to develop together realized any profits during their association.  Beyond this 
 basic information, however, the precise nature of the business relationship 
 between the two is difficult to discern.  This task is complicated by the fact 
 that Post died prior to the commencement of this suit, leaving the parties to 
 rely primarily on the testimony of Kisteneff in its inquiry.
The record shows, in the spring of 1995, 
 Kisteneff met Post by telephone after John Canney, an associate of Kisteneffs, 
 told Kisteneff that Post was looking for someone with whom he could get back 
 into the real estate business.  At this time, the two discussed the possibility 
 of working together on some real estate development opportunities.  At the time, 
 Post had already identified a potential project in Quincy, Massachusetts.  The 
 Quincy project did not go through, but the two men subsequently met to discuss 
 another possible project in Broughton, Connecticut.  At this meeting, Kisteneff 
 claims he proposed forming a partnership with Post, but Post refused, claiming 
 he could not hold an ownership interest in any new venture because it would 
 be subject to liens due to outstanding taxes and judgments he owed.  Both men 
 then agreed that some type of arrangement would be reached among themselves 
 and Canney, whereby they would work together and each receive a third of any 
 profits from a successful project.  The fundamental principle behind their association 
 was that they would share equally in any profits, once the project was built 
 and succeeded in selling.  
In May 1995, Kisteneffs attorney drafted 
 a letter to John Canney, following a discussion with Post and his wife, concerning 
 the appropriate entity with whom the parties should contract.  The letter proposed 
 that Canney and Kisteneff prepare a letter on behalf of WAGA Investment Associates, 
 L.P., which would contain language whereby WAGA would agree to contract for 
 the services of Post.  The proposed language included that Post would as WAGAs 
 Agent, negotiate the purchase and sale agreement and direct all permitting, 
 development and construction activities subject . . . to WAGAs supervision 
 and direction.  It further stated, For your [Posts] services, you will receive 
 one-third of cash flow arising from operations, sale or refinancing including, 
 without limitation, any development fee that is payable pursuant to the financing.  
 The WAGA partnership was never formed after plans for the Quincy construction 
 project fell through.  However, the three discussed the letter, and, according 
 to Kisteneff, they all agreed that it laid a good foundation for our relationship.  
 Despite this false start, Kisteneff testified that:

[The letter] asserted the principle 
 that a partnership would be formed in the event that we did develop the property 
 together which would be between me and Mr. [Canney], and Mr. [Canney] and I 
 would then turn around and contract with Mr. Post for [his] services, and that 
 he would participate in one third of the profit of a successful project after 
 he did what he was supposed to do, which was supervise construction and also 
 sell the units.  

During cross-examination, Kisteneff was pressed 
 further about the agreement he had reached with Post.  Unable to recall precise 
 details, Kisteneff described their relationship after their initial personal 
 meeting in general terms:

I do not have a specific recollection 
 of what was talked about in the car.  We were getting acquainted, and talking 
 about the possibilities of doing the possible project in Broughton.
But I would think it logical 
 that at that meeting, possibly in the car when we were tooling around Broughton, 
 that we came to terms on what our roles would be and what our rewards would 
 be. 
What our roles and rewards would 
 be for discharging those roles, and the fundamental principle is basically only 
 one, sir.  The fundamental principle was that we would share equally in the 
 profits of the project.  

Kisteneff stated he agreed to compensate [Post] 
 for [his] participation in the process.  Kisteneff further testified, he put 
 the seed money into the projects and was responsible for the ultimate financing 
 and that he had sole control of the deals because I was the only one at risk.  

After some investigation, and on advice of his 
 bank, Kisteneff decided he would not go forward on the Broughton deal.  Over 
 the next year, however, three other properties were considered for development:  
 one in Boston, Massachusetts, one in Cranston, Rhode Island and a third in Greenville, 
 South Carolina.  In August 1995, Canney and Post contacted Kisteneff 
 about the Boston property, and the men discussed developing single-family housing 
 there.  Post indicated he believed they could acquire the necessary permits 
 and break ground by March 1996.  Kisteneff agreed with the proposal and authorized 
 [Post and Canney] to get going on the project.  
In September 1995, Post called Kisteneff and requested 
 Kisteneff advance him money in order to keep the wolf away from the door.  
 Post told Kisteneff he would pay him back out of his share of the profits of 
 one of their deals.  Kisteneff arranged for his own company, KCI Management 
 Corporation, to advance Post $5,000 per month against his future share of any 
 profits realized in the Boston project.  These payments continued for a period 
 of fifteen months, through November 1996 when Kisteneff was required to turn 
 his financial resources toward purchase of the Boston property.  
Unfortunately, the Boston project encountered objections 
 from local residents, and the City of Boston responded by drawing out the permitting 
 process.  The City ultimately denied the necessary building permits in March 
 1997.  By this time, Kisteneff had purchased the property, and he felt it necessary 
 to bring a lawsuit against the City of Boston for wrongful denial of the permits.  
 Although the court ruled in Kisteneffs favor and ordered the City to issue 
 the permits, the City filed an appeal, preventing any further development of 
 the Boston property.  
In late 1995, Post brought to Kisteneffs attention 
 the property located in Cranston, Rhode Island.  In January 1996, Kisteneff 
 authorized Post to execute a purchase and sale memorandum on behalf of KCI Management 
 Corporation setting out a formula for the purchase of the land.  Post executed 
 the document as Vice President of KCI.  Although Canney, Post and Kisteneff 
 attempted to secure financing for the project throughout 1996, by the end of 
 the year, they were unable to locate the two million dollars they needed for 
 the project.  In late 1996 and early 1997, Post informed Kisteneff that the 
 owner of the Cranston property intended to withdraw the property from sale, 
 and their open-ended contract on the property was most likely unenforceable.  
 Several months later, Post called Kisteneff and told him he planned to reinsert 
 himself into the Cranston deal without Kisteneff.  After objection from Kisteneff, 
 Post told him he would see what [he could] do about letting [Kisteneff] into 
 the deal.  Apparently, Post did not include Kisteneff in the deal but had already 
 begun to work with someone else on the development of the property.  Kisteneff 
 testified Post went into business with this other person in January 1997, and 
 negotiated a $450,000 payment for the work Post had performed on the project 
 prior to his association with this other person.  According to Kisteneff, Post 
 also negotiated salaries for himself and his wife, along with a forty percent 
 share in profits on the project.  
In February, 1996, Post traveled to South Carolina, 
 at which time Kisteneff showed Post some Greenville property he was interested 
 in them developing together.  Kisteneff had been working on the Greenville property 
 for over a year at that time.  Within a week of Posts visit, Kisteneff placed 
 a deposit on the property.  
By the end of 1996, Kisteneff had spent in excess 
 of $600,000 and had gone into debt for $300,000, for a total of $900,000 contributed 
 toward the potential projects.  Post, however, had contributed no money to any 
 of the land purchases.  
Kisteneff testified, as he believed they were closer 
 to getting the Boston project underway, he sought to formalize his working relationship 
 with Post.  Accordingly, Kisteneff proposed that he and Post form a corporation 
 named ALMA.  Post would not personally be a stockholder in the corporation because 
 he did not want his creditors to be able to get at him, so they discussed 
 that the corporation would formally employ Post as he worked on the various 
 projects.  In August 1996, Kisteneff had his attorney draft a series of documents 
 to put his proposed arrangement with Post in writing.  After sending those documents 
 to Post and his attorney in late August 1996, Post did not initially respond.  
 After a few months, Posts attorney returned the documents with notations indicating 
 they would not be executed.  According to Kisteneff, Posts only response was 
 a counter-offer communicated through Posts attorney for a single project in 
 Alma, South Carolina a place that Kisteneff knew did not exist.  Kisteneff 
 questioned Post and Posts attorney regarding the proposed change in their deal, 
 but each responded they were merely acting on the instruction of the other.  
 According to Kisteneff, with the exception of a March 1997 communication, Post 
 barely spoke to him after December 1996, shortly after he sent him the last 
 monthly $5,000 check.  Post did not call or suggest any new deals or bring Kisteneff 
 any new prospects.  At this time, Kisteneff concluded Post no longer wanted 
 to do business with him.  
Kisteneff testified he did not hear from Post again 
 until March or April 1998, when Kisteneff received a favorable ruling on the 
 permits issue in Boston, and all of a sudden, [Post] reappeared.  On April 
 1, 1998, Kisteneff wrote Post a letter asking him not to interfere with Kisteneffs 
 negotiations of settlement with the City of Boston.  Post, however, would not 
 agree to the request.  By letter dated April 20, 1998 Kisteneff referred to 
 an April 3, 1998 conversation he had with Post, and informed Post he was stunned 
 to hear Post describe his version of their deal.  Kisterneff stated that after 
 loaning Post $5,000 a month for fifteen months, when the well ran dry, Post 
 virtually dropped out of sight.  He then notified Post, that any relationship 
 between Post and KCI was terminated by Posts refusal to negotiate and define 
 a written agreement with KCI, despite KCIs efforts to do so.   Kisteneff further 
 asked Post to execute an enclosed promissory note for the repayment of the $75,000 
 that had been advanced to Post, and to submit an estimate for the services Post 
 rendered to KCI for the Boston project.  
In June 1998, KCI initiated the present 
 declaratory judgment action in response to claims by Post that he possessed 
 an equitable interest in the Greenville and Boston properties.  While various 
 other causes of action were subsequently added by the parties, the only issue 
 submitted to the jury was whether Kisteneff and Post entered into a partnership 
 agreement regarding development of the real estate in question.  Appellant now 
 appeals the jurys verdict finding no partnership existed, as well as two rulings 
 by the trial court regarding the trial judges instructions to the jury.
LAW/ANALYSIS
I.       Trial Courts Jury Instructions
Appellant first argues the trial court 
 erred on two occasions in instructing the jury on the law.  We find no reversible 
 error.  
The trial judge is required to charge the current 
 and correct law.  McCourt v. Abernathy, 318 S.C. 301, 306, 457 S.E.2d 
 603, 606 (1995).  When reviewing jury charges for error, an appellate court 
 must consider the courts jury charge as a whole in light of the evidence and 
 issues presented at trial.  Keaton ex rel. Foster v. Greenville Hosp. Sys., 
 334 S.C. 488, 497, 514 S.E.2d 570, 575 (1999).  A jury charge is correct if, 
 when read as a whole, it contains the correct definition and adequately charges 
 the law.  Id. at 495-96, 514 S.E.2d at 574.  If the charges given, as 
 a whole, are reasonably free from error, isolated portions which might be misleading 
 do not constitute reversible error.  Id. at 497, 514 S.E.2d at 575.  
 Further, refusal to give a properly requested charge is not error if the general 
 instructions are sufficiently broad to enable the jury to understand the law 
 and the issues involved.  McCourt, 318 S.C. at 306, 457 S.E.2d at 606.
A.      Jury Instruction on Contract Law  

Appellant takes exception to the trial courts 
 decision to instruct the jury on the elements of contract formation.  She argues 
 this instruction was wholly irrelevant to the question of partnership formation 
 and thereby served to sow seeds of confusion in the jurors minds.  We disagree.
A partnership is an association of two or more 
 persons, to carry on as co-owners a business for profit.  S.C. Code Ann. § 33-41-210 
 (Supp. 2003); Buffkin v. Strickland, 280 S.C. 343, 345, 312 S.E.2d 579, 
 580 (Ct. App. 1984).  A partnership agreement may rest in parole.  It may also 
 be implied and without express intention.  Halbersberg v. Berry, 302 
 S.C. 97, 101, 394 S.E.2d 7, 10 (Ct. App. 1990).  A partnership is a relation 
 arising out of contract, and a partnership between parties arises only out of 
 the contract of the parties, as expressed in their agreement or implied from 
 their dealings with each other and others.  Stephens v. Stephens, 213 
 S.C. 525, 531, 50 S.E.2d 577, 579 (1948).  One of the most important tests as 
 to the existence of a partnership is the intention of the parties.  Id. 
 at 530, 50 S.E.2d at 579.  If parties intend to and do enter into a contract 
 as in the eye of the law constitutes a partnership, they thereby become partners 
 whether they are designated as such or not in their contract.  Id. at 
 530-31, 50 S.E.2d at 579.  Thus, where the parties to a contract, by their 
 acts, conduct, or agreement show that they intended to combine their 
 property, labor, skill and experience, or some of these elements on one side 
 and some on the other, to carry on as principals or co-owners, a common 
 business, trade, or venture as a commercial enterprise, and to share, either 
 expressly or by implication, the profits and losses or expenses that may be 
 incurred, such parties are partners.  Id. at 531-32, 50 S.E.2d at 580 
 (emphasis added).  Where there is no express contract, either written or verbal, 
 common tests used in determining whether a partnership exists are:  (1) the 
 sharing of profits and losses; (2) community of interest in capital or property; 
 and (3) community of interest in control and management.  Halbersberg, 
 302 S.C. at 101, 394 S.E.2d at 10;  Stephens, 213 S.C. at 532, 50 S.E.2d 
 at 580. 
The threshold question for the jury in this case 
 was whether the parties entered a contract whereby they intended to carry on 
 a business as principals and co-owners.  While it is not necessary there be 
 an express agreement between the parties to enter a partnership before such 
 a partnership can be found, there must be an intent of the parties to enter 
 into a contract that would, in the eyes of the law, constitute a partnership, 
 before such a finding can be made.  Thus, the law of contract was not wholly 
 irrelevant to the issues at hand.  Further, in looking at the various tests 
 applicable to the question of whether a partnership existed, a critical aspect 
 of the jurys determination in this case rested on whether the parties proposed 
 agreements as to compensation, ownership, and management were ever entered into 
 and finalized between and among the principals involved.  In light of this, 
 the contract formation elements of offer, acceptance, and consideration that 
 were included in the trial judges instructions to the jury were more likely 
 to help rather than hinder the jurys deliberations.  At any rate, we find, 
 when considered as a whole, the charges were reasonably free from error, and 
 any isolated portions which might have been misleading do not constitute reversible 
 error. 
B.      Sufficiency of Instruction in Response to Jury Question
Appellant also takes exception to the 
 sufficiency of the trial judges response to a request for clarification the 
 jury submitted to the court during deliberations.  On this point, too, we find 
 no error.
During deliberations, the jury requested 
 clarification of the elements that had to be shown to prove a partnership existed.  
 In its initial instructions, the trial court charged the jury on the statutory 
 and common law rules and tests for determining the existence of a partnership.  
 Specifically, the court charged S.C. Code Ann. § 33-41-210 (Supp. 2003), defining 
 a partnership as an association of two or more persons to carry on as co-owners 
 a business for profit, as well as S.C. Code Ann. § 33-41-220 (1990), which provides 
 as follows:

In determining whether a partnership exists, these rules shall 
 apply:
(1) Except as provided by § 33-41-380 persons who are not 
 partners as to each other are not partners as to third persons;
(2) Joint tenancy, tenancy in common, tenancy by the entireties, 
 joint property, common property or part ownership does not of itself establish 
 a partnership, whether such co-owners do or do not share any profit made by 
 the use of the property;
(3) The sharing of gross returns does not of itself establish 
 a partnership, whether or not the persons sharing them have a joint or common 
 right or interest in any property from which the returns are derived; and
(4) The receipt by a person of a share of the profits of a 
 business is prima facie evidence that he is a partner in the business, but no 
 such inference shall be drawn if such profits were received in payment
 
(a) as a debt by installments or otherwise,
(b) as wages of an employee or rent to a landlord,
(c) as an annuity to a widow or representative of a deceased 
 partner,
(d) as interest on a loan, though the amount of payment vary 
 with the profits of the business or
(e) as the consideration for the sale of the good will of 
 a business or other property by installments or otherwise.
 
The court also charged under the common law as follows:
In South Carolina a partnership does not have to be in writing.  
 A partnership may be formed by oral agreement and may even be implied to exist 
 by conduct of the parties without any evidence of expressed intent to form a 
 partnership.  The following tests are appropriate in determining whether a partnership 
 exists:  the sharing of profits and losses, community of interest in capital 
 or property, and community of interest in control or management.

The jury was apparently confused, however, as to 
 whether all of the elements under these tests had to be proven for a partnership 
 to exist, sending a note to the trial judge asking:  Requirements/clarification 
 of the law re: existence of a partnership.  Do all the requirements have to 
 exist?  Unclear as to whether the jury was referring to the statutory rules 
 or common law tests, the trial judge asked them to elaborate.  The jury responded:  
 Requirements or elements that make a partnership; example, one, oral agreement; 
 two, actions of each party, etc.  Please give complete list and tell us how 
 many or all of these components exist.  Concerned that the jury was asking 
 the court to make a factual finding, it asked the jury foreman for further elaboration 
 when the jury returned to the courtroom.  The foreman responded:  What I meant 
 was not for you to tell us which things exist, but how many are necessary to 
 exist in order to make it --.  Satisfied with the foremans clarification, 
 the trial court recharged the jury with the substance of §§ 33-41-210 and 33-41-220, 
 as well as the common law as to the manner in which a partnership may be formed 
 and the common law tests, as initially charged by the court.  The court further 
 instructed:

These rules and the tests I stated 
 earlier are simply factors to be considered by you in determining whether or 
 not a partnership exists as I have defined partnership, which, again, is an 
 association of two or more persons to carry on as co-owners a business for profit.

Appellant contends the trial courts supplemental 
 instructions did not adequately answer the jurys question and the court erred 
 in failing to instruct the jury that no particular number of statutory factors 
 under § 33-41-220 need be proven in order to permit the finding of a partnership.  
 We disagree.  By admonishing the jury that the rules and tests described were 
 simply factors to be considered by the jury in making its determination, we 
 find the jurys concern about applying one or all of the elements was adequately 
 addressed.  This instruction from the trial judge sufficiently advised the jury 
 that no particular number of statutory factors were necessary.  The general 
 instructions given by the court were sufficiently broad to enable the jury to 
 understand the law and the issues involved.  Accordingly, we find no error with 
 the trial judges response to the jurys question.
II.      Entitlement to New Trial Based on the Evidence
Finally, Appellant argues the record contains no 
 evidence to reasonably support the jurys findings. She therefore asserts she 
 is entitled to a new trial.  We disagree.
In an action at law, on appeal of a case tried 
 by a jury, the appellate court will correct errors of law, but will not disturb 
 a factual finding of the jury unless a review of the record discloses no evidence 
 to reasonably support the jurys findings.  York v. Conway Ford, Inc., 
 325 S.C. 170, 174, 480 S.E.2d 726, 728 (1997).  This court has no power to review 
 matters of fact in an action at law, except to determine if a verdict is wholly 
 unsupported by the evidence.  Id.
South Carolinas Uniform Partnership Act defines 
 a partnership as an association of two or more persons to carry on as co-owners 
 a business for profit. . . . S.C. Code Ann. § 33-41-210 (Supp. 2003).  In applying 
 this definition, our courts have held:  The following tests are appropriate 
 in determining whether a partnership exists:  (1) the sharing of profits and 
 losses; (2) community of interest in capital or property; and (3) community 
 of interest in control and management.  Halbersberg v. Berry, 302 S.C. 
 97, 101, 394 S.E.2d 7, 10 (Ct. App. 1990).  In the present case, we find the 
 evidence regarding the intended ownership structure, treatment of profits and 
 losses, and control and management over the ventures was sufficient for the 
 jury to reasonably conclude a partnership did not exist.
Specifically, there is evidence from which the 
 jury could conclude that Post was not a co-owner in the venture and did not 
 hold any community of interest in the capital or property at issue.  As noted 
 above, Kisteneff testified that when he proposed that he and Post enter into 
 a partnership, Post expressly declined, citing his inability to hold an ownership 
 interest in any new venture due to the personal liens and judgments that had 
 been entered against him.  Moreover, it is undisputed that Post never invested 
 any capital toward the real estate projects in question.
Further, there is evidence from which the jury 
 could determine Post did not hold any community of interest in control and 
 management of the projects.  The WAGA letter, which Kisteneff testified they 
 all agreed laid the foundation to their relationship, clearly contemplated an 
 association whereby Post would be an agent of the partnership between Kisteneff 
 and Canney, but would not, himself, be a partner.  Kisteneff also testified 
 to instances where he authorized Post to begin work on a project or to execute 
 a contract on behalf of KCI, thereby evincing Kisteneffs control and management 
 over the projects.  Kisteneff further maintained, because he was the only one 
 investing money and was the only one at risk in the ventures, he had sole control 
 over the projects. 
Finally, the jury could reasonably find that a 
 partnership was not implied from the sharing of profits and losses.  When examining 
 profit-sharing arrangements for the purpose of determining the existence of 
 a partnership, the Act provides that:

The receipt by a person of a 
 share of the profits of a business is prima facie evidence that he is a partner 
 in the business, but no such inference shall be drawn if such profits were received 
 in payment
(a) as a debt by installments 
 or otherwise,
(b) as wages of an employee or 
 rent to a landlord,
(c) as an annuity to a widow 
 or representative of a deceased partner,
(d) as interest on a loan, though 
 the amount of payment vary with the profits of the business or
(e) as the consideration for 
 the sale of the good will of a business or other property by installments or 
 otherwise.

S.C. Code Ann. § 33-41-220(4) (Supp. 2003).  
Although there is evidence KCI advanced 
 Post a total of $75,000 against his future share of profits in the Boston project, 
 it is undisputed that no profits were ever actually realized from this project 
 or any other.  The testimony from Kisteneff shows their agreement was that Post 
 was to share in the profits if and only if the projects were successful enough 
 to produce profits.  Thus, Post did not actually receive a share of the profits, 
 but only an advance toward the monies the parties contemplated he would realize 
 from his association in the ventures.  As discussed above, there was substantial 
 evidence that Kisteneff and Canney intended to structure their relationship 
 with Post so that Post would be employed as an agent, and the distribution of 
 any profits to him would be classified as compensation, or wages, for work performed 
 on the venture.  Accordingly, there is evidence from which the jury could have 
 determined, pursuant to § 33-41-220(4)(b), no inference should be drawn as to 
 a partnership based on the $75,000 advance.  Finally, one of the appropriate 
 tests in determining the existence of a partnership is not simply consideration 
 of the sharing of profits, but also the sharing of losses.  The evidence here 
 shows no attendant sharing in losses by Post.
For these reasons, we find sufficient evidence 
 of record to reasonably support the jurys finding that no partnership existed.       

CONCLUSION
For the foregoing reasons, we find 
 no error with the trial judges instructions to the jury.  We further find the 
 evidence adduced at trial reasonably supports the jurys verdict, and appellant 
 is therefore not entitled to a new trial.  The ruling of the trial court is
 AFFIRMED.
HUFF, STILWELL, and CURETON, JJ., concur.

 
 [1] Ultimately, 
 Alexis Pierre Kisteneff was added as a plaintiff andBara Post, individually 
 and as the personal representative of her late husband, Malcolm Post, was 
 substituted as defendant after Malcolms death.